UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

MICHAEL R. PICKLE, et al.,

     Plaintiffs,

v.

                               No. 1:19-CV-147-H

UNIVERSAL CABLE HOLDINGS,
INC. d/b/a SUDDENLINK
COMMUNICATIONS,

     Defendant.

## MEMORANDUM OPINION AND ORDER

Like many companies, SuddenLink compensates its sales team with commissions that are contingent on the employees' sales. Before the Court are the parties' cross-motions for summary judgment on Michael R. Pickle's and Michele Kirkland's breach-of-contract claims for SuddenLink's 75% reduction of plaintiffs' commission over a year after they closed a historically large deal for the company. SuddenLink contends that the commission plan was merely an incentive and did not form a contract, but even if it did, SuddenLink asserts that it possessed the unilateral authority to reduce the commission retroactively. Conversely, plaintiffs argue that SuddenLink's commission plan was a unilateral offer, which they accepted by closing the commission-earning deal, and thus formed a valid contract.

After reviewing the motions, the parties briefing, and the relevant law, the Court finds that, as a matter of law, the parties formed a valid and enforceable contract. But there is a genuine issue of material fact as to whether circumstances warranted commission reduction—and thus whether SuddenLink breached the contract. Accordingly, the Court grants plaintiffs' motion in part and denies SuddenLink's.

## 1.    Factual Background

### A.    Plaintiffs' Employment Relationship with SuddenLink

Plaintiff Michael R. Pickle was employed by SuddenLink between August 2011 and September 2019. Dkt. No. 27-2 at 3. SuddenLink[1] is a high-speed data provider that provides commercial and residential service in 15 states. Dkt. No. 31 at 5. During this time, Pickle worked as an Account Executive and later as a Regional Sales Manager. Dkt. No. 27-2 at 3–4. SuddenLink hired plaintiff Michele Kirkland as an Account Executive in 2013, and she remains employed by SuddenLink. Dkt. No. 27-3 at 3.

SuddenLink compensates executive employees, including account executives and regional sales managers, with both salary and commissions earned from sales of SuddenLink's services and goods. *See* Dkt. No. 27-4 at 7. SuddenLink promulgates commission plans that govern the earning and payment of commissions. *Id.*

### B.    The SuddenLink 2017 Commission Plan and Notable Provisions

In 2017, both plaintiffs were eligible for commission payments, which were governed by SuddenLink's 2017 Commission Plan. Aside from different commission percentages, the plaintiffs' plans were identical.[2] *See* Dkt. Nos. 27-8, 27-9. The terms of the 2017 Plan allowed participants to receive commission advances before they were earned. *See* Dkt. No. 27-8 at 5.

---

[1] Altice is SuddenLink's parent company. Dkt. No. 31 at 5. As a result, several documents referred to in this Order use the name Altice rather than SuddenLink. *Id.* For the purposes of this Order, these names are interchangeable.

[2] The plaintiffs' respective plans were identical except that one plan called for a 3% commission, while the other 7%.

But before a commission could be advanced, several conditions must have been satisfied: (1) an agreement must be signed by the customer; (2) the contracted installation must be complete; and (3) the customer's order must be entered into SuddenLink's billing system. *Id.* at 5–6. The 2017 Plan expressly provided that an advancement on commission does not constitute earned wages until the commission is no longer subject to "chargebacks." *Id.* at 5. Chargebacks occur when a customer cancels or modifies the contracted service prior to the expiration of a specified period.[3] Once these conditions were met—and the sale could no longer be rescinded—the commission is earned under the 2017 Plan.

The 2017 Plan provided that plaintiffs would receive commission on non-recurring charges (NRC). *Id.* at 4. NRCs include installation charges, construction fees, equipment fees, and other non-recurring charges. *Id.* at 3. The 2017 Plan also included several important provisions that allowed SuddenLink to make changes to the plan and commission calculations:

> **Plan/Quota Modification:** Minimum performance standards are set by management based on New NRC per month. Management retains the exclusive right and discretion to review and prospectively modify the Plan and/or any quota upon reasonable notice to Employee. Management further retains the right to modify any commission calculations where circumstances warrant.
>
> . . . .
>
> **Company Discretion:** In accordance with applicable law, the Company reserves the right to amend this Plan at any time; provided that any amendment shall apply prospectively.

Dkt. No. 27-8 at 5, 7.

---

[3] For contracts lasting one year or less and month-to-month contracts, a chargeback can occur within six months after the installation date. Dkt. No. 27-8 at 5. For contracts lasting two years or longer, a chargeback can occur anytime within the first year after the installation date. *Id.*

### C.   The West Texas Telecommunications Consortium Contract

Plaintiffs were members of the sales team that secured a bid and eventual contract with the West Texas Telecommunications Consortium (WTTC) to provide a wide array of equipment and services to school districts in West Texas. Dkt. No. 32 at 226, 229. This contract provided for approximately $17.6 million in construction costs alone. Dkt. No. 27-4 at 13. The WTTC contract was a substantial deal that far exceeded SuddenLink's typical contracts.[4] Based on the scale of the WTTC project, construction was ongoing throughout 2018 and 2019. Dkt. No. 32 at 227. As a result, the plaintiffs were not eligible for a commission advance under any commission plan until October 2018, following the completion of the first installation. *Id.*

### D.   SuddenLink's Modification of the WTTC Commission Calculation

When the WTTC deal closed in May 2017, the plaintiffs' commission was governed by the then-active 2017 Plan. *See generally* Dkt. No. 27-8. The 2018 Plan superseded the 2017 Plan the following year before any of the commission was earned—as defined by both the 2017 and 2018 Plans. *See id.*; Dkt. No. 32 at 29. In October 2018, SuddenLink notified the plaintiffs that it intended to modify their WTTC deal commission. *Id.* at 223. In November 2018, SuddenLink instituted an exception-plan amendment solely applicable to the WTTC deal, which reduced plaintiffs' commissions by over 75%. Dkt. No. 32 at 140–41.

---

[4] SuddenLink contends that the majority of its sales contracts have an NRC worth only hundreds of dollars or less. Dkt. No. 28 at 12. SuddenLink characterized this deal as a "'one-of-a-kind' deal" that was a significant outlier. *Id.*

**2.     Procedural History**

Pickle filed his Original Petition in the 42nd Judicial District Court of Taylor County, Texas.  Dkt. No. 1-1 at 8.  SuddenLink removed the case to this Court.  Dkt. No. 1.  Kirkland was added as a plaintiff after the case was removed.  Dkt. No. 12.  SuddenLink filed a motion for summary judgment on all claims (Dkt. No. 25), and plaintiffs filed a motion for partial summary judgment (Dkt. No. 30).  In their response to SuddenLink's motion, Pickle expressly waived the second breach-of-contract claim that is unrelated to the WTTC commission.  Dkt. No. 36 at 29.  Therefore, there is only one remaining breach-of-contract claim to resolve.  Both motions have been fully briefed and are ripe for review.

**3.     Applicable Law and Legal Standards**

**A.     Texas substantive law governs this case.**

"A federal court sitting in diversity follows the choice of law rules of the state in which it sits."  *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 258 (5th Cir. 2014).  Under Texas choice-of-law rules, courts look to the Restatement (Second) of Conflicts of Laws.  *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008).  The Texas Supreme Court has recognized that contractual choice-of-law provisions should generally be enforced but has also stated that the contracting parties' freedom to choose what law will apply is not unlimited.  *Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306–07 (5th Cir. 2006) (quoting *Desantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)).  That freedom is limited by Section 187 of the Restatement.  *Id.*

Before engaging in a choice-of-law analysis under the Restatement, a Texas court must first determine whether Texas law is, in fact, inconsistent with other potentially applicable law.  *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984), *superseded*

*by* Tex. Civ. Prac. & Rem. Code §§ 33.001–.004. If the laws are consistent, a court need not undertake a choice-of-law analysis, and Texas law will govern the dispute. *See Sonat Expl.*, 271 S.W.3d at 231; *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 377–78 (Tex. App.—Fort Worth 2003, pet. denied). The party seeking application of the laws of a state other than Texas bears the burden of demonstrating that Texas law conflicts with the other state's law. *Playboy Enters. v. Sanchez-Compuzano*, 519 F. App'x 219, 225 (5th Cir. 2013). Texas courts assume that the other states' laws are the same as its own. *Id.*

Here, the 2017 Plan contains a Missouri choice-of-law provision. However, the parties agree that the outcome of the case is the same regardless of whether the Court applies Texas or Missouri law. Neither party demonstrates an inconsistency between the laws. As a result, the Court need not further address the choice-of-law issue here and will apply Texas law in this case.

### B.    Federal standards for summary judgment apply.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The precise standard for summary judgment depends on whether the movant bears the burden of proof on the claim for which summary judgment is sought. When "the movant bears the burden of proof on an issue, either because [it] is the plaintiff or as a defendant [it] is asserting an affirmative defense, [it] must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016).

Movants must cite to particular parts of the record to show the absence of a genuine dispute or explain why the cited materials do not create a genuine dispute. Fed. R. Civ. P. 56(c)(1). The Court must consider materials cited by the parties but may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

In evaluating a motion under Rule 56, the Court must determine whether, after considering the evidence in the light most favorable to the nonmoving party, a rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "[T]he substantive law will identify which facts are material." *Id.* at 248.

**4.   Analysis**

Under Texas law, the essential elements of a breach-of-contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.— Houston [1st Dist.] 2001, no pet.)).

"Whether a party has breached a contract is a question of law for the court[,]" not a question of fact for the jury. *X Technologies, Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413 (5th Cir. 2013) (quoting *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied)). "The court determines what conduct is

required by the parties, and to the extent the parties dispute whether or not they have performed that conduct, the court submits that factual dispute to the jury." *Id.* at 413–14 (internal quotations omitted). When facts are undisputed or conclusively established, there is no need to submit these issues to a jury. *Id.*

### A.   The 2017 Plan is the operative agreement for plaintiffs' breach-of-contract claim.

The resolution of this case requires the Court to interpret the meaning of several commission plans—namely the 2017 and 2018 Plans—and determine which plan was operative when the WTTC deal was made. The plaintiffs maintain one breach-of-contract claim at the summary-judgment stage. Dkt. No. 31 at 6. The parties do not dispute that the plaintiffs were a part of the sales team that closed the WTTC deal in May 2017. The parties also agree that the 2017 Plan was operative from February 1, 2017, to the date of its replacement in January and July 2018.[5] However, plaintiffs contend that the 2017 Plan is the relevant commission plan, and SuddenLink argues that the 2018 Plan controls.

The Court finds that the 2017 Plan governs the WTTC deal commission and thus, plaintiffs' breach-of-contract claim. Plaintiffs' claim is premised on their acceptance of a unilateral offer by performance—through the closing of the WTTC deal in May 2017— which SuddenLink breached by reducing their commission in November 2018. Under the plaintiffs' theory, the 2017 Plan created a unilateral offer that was capable of acceptance by performance and that this offer was accepted when they closed the WTTC deal. Therefore,

---

[5] The plaintiffs received their new commission plans at different times—Kirkland received hers in January 2018 and Pickle received his in July 2018. *See* Dkt. No. 32 at 25, 45.

the only plan that could have formed a contract was the 2017 Plan because the plaintiffs

would be unable to accept an offer in May 2017 that did not exist until January 2018.[6]

Conversely, SuddenLink argues that the terms of the 2018 Plan control because, at

the time of the alleged breach in November 2018, the 2018 Plan was operative and had

superseded the 2017 Plan.[7]  SuddenLink goes on to explain that the modification of the

commission was not the commission calculated under the 2017 Plan, but rather the 2018

Plan.  Both plans call for the same commission calculations for both plaintiffs, but the 2018

Plan grants SuddenLink considerably more discretion to modify the commission plan.[8]

After considering the parties' arguments and the relevant facts, the Court finds that

the 2017 Plan controls here.  First, the 2018 Plan did not exist at the time the unilateral offer

was accepted in May 2017.  SuddenLink incentivized its employees to perform with the

2017 Plan, and the parties formed a contract when the plaintiffs closed the WTTC deal.

Other than waiting to see if the customer instituted any chargebacks, the plaintiffs'

performance was complete.  And although the alleged breach occurred after the 2018 Plan

was created, SuddenLink's offer and the subsequent agreement at the time of performance—

closing the WTTC deal—made clear that while the company reserved the right to amend

the plan, "any amendment shall apply prospectively."  Thus, the 2018 Plan could alter the

---

[6] In their pleadings, plaintiffs claim that "Suddenlink has breached its contract with Plaintiffs, giving Plaintiffs an immediate right to all compensation due and that was or would be otherwise due to them under the relevant commission plan for the Region 14 deal." Dkt. No. 19 at 4.  This assertion is consistent with plaintiffs' current position that their claim arises from the 2017 Plan.

[7] The 2017 Plan stated that it "shall remain in full force and effect from [February 1, 2017] until Altice issues a written replacement plan." Dkt. No. 27-8 at 6.  Altice issued a written replacement plan for the plaintiffs in January and July 2018.  Therefore, the 2017 Plan was no longer in effect.

[8] The 2018 Plan did not require that changes to the plan be made prospectively and further stated that it "may amend, supplement, supersede, or terminate any compensation plan, including the 2018 Sales Commission Plan, at any time and at its own discretion." Dkt. No. 32 at 27.

terms of any new performance, but it could not alter the terms of the existing contractual obligations created under the 2017 Plan's terms. Later, the 2018 Plan gives SuddenLink more unilateral authority to amend, but that language is not present in the 2017 Plan.

Additionally, the 2018 Plan by itself was not a contract at all but rather a new unilateral offer—just as the 2017 Plan was before plaintiffs performed. Had the parties agreed to the terms of the 2018 Plan and also agreed that the 2018 Plan control over previous performance to modify the 2017 Plan retroactively, then the new agreement would be the operative contract as SuddenLink argues. *See Higby Crane Servs., LLC v. Nat'l Helium, LLC*, 703 F. App'x 687, 692 (10th Cir. 2017) (reasoning that a later agreement controlled when all of the elements of a new contract were present). But that is not the case here. Even though Kirkland signed the modification to the 2018 Plan, its explicit language makes clear that the parties' signatures are not an acceptance of the terms and the creation of a contract, but only a confirmation of notice. Dkt. No. 32 at 141.

Finally, SuddenLink argues that because the WTTC deal commission was not yet earned under the terms of either the 2017 or 2018 Plans, it was subject to change through the 2018 Plan and its subsequent amendment. The Court is not persuaded by this argument. As addressed below in more detail, the chargeback period and other conditions present in both plans were merely conditions precedent to performance—not contract formation. Accordingly, the Court finds that the 2017 Plan is the operative commission agreement here.

### B. The 2017 Plan was a unilateral offer that formed an enforceable contract upon acceptance by performance.

"What constitutes an enforceable contract is a question of law for the trial court." *Adams v. Mut. of Omaha Ins. Co.*, No. 3:13-CV-4881-D, 2015 WL 1378720, at *2 (citing *Gaede*

*v. SK Ins. Inc.*, 38 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)). A valid and enforceable contract under Texas law requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) a communication that each party consented to the terms of the contract; (5) execution and delivery of the contract with an intent that it be mutual and binding on the parties; and (6) consideration." *Owens v. Specialized Loan Servicing, L.L.C.*, 694 F. App'x 950, 953 (5th Cir. 2017) (citing *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

Plaintiffs contend that the 2017 Plan was a unilateral offer that was accepted through performance and formed an enforceable contract. Dkt. No. 31 at 15. Conversely, SuddenLink contests that there was a meeting of the minds and an intent to execute a mutual and binding contract. It argues that because it retained the ability to unilaterally modify the plans, the 2017 Plan was merely an aspirational incentive, not an enforceable contract. Dkt. No. 28 at 25.

### i.   The disclaiming language in the 2017 Plan does not prohibit the formation of an enforceable contract.

"In construing a written contract, the Court's task is to ascertain the intentions of the parties as expressed in the contract." *Marathon E.G. Holding Ltd v. CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010) (citing *Valence Operating co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)). The Court first considers whether the language of the 2017 Plan demonstrates that the parties did not intend to form an enforceable contract. *See, e.g., Oldham v. ORIX Fin. Servs., Inc.*, No. 3:05-CV-2361-M, 2007 WL 530202, at *2 (N.D. Tex. Feb. 21, 2007). Numerous principles help guide this analysis. For example, if the document contains an express disclaimer prohibiting its use as an enforceable contract or otherwise demonstrates

an intent not to be contractually bound, the Court may find that a contract cannot exist.
*See, e.g., id.* at *3.

Similarly, when an agreement's language makes clear that it creates only an
incentive program, there is no contract. In *Oldham v. ORIX Financial Services, Inc.*, for
example, the Northern District of Texas found that a sales-incentive plan was not an
enforceable contract. *Id.* There, the alleged contract included the following language:
(1) "no policy, guideline or other statement . . . shall give rise to any contractual obligation";
(2) "[b]eing a Participant is not a guarantee that any incentive will be granted to the
Participant"; (3) "no rights shall vest . . . until all conditions of the Plan are satisfied"; and
(4) "the Plan Committee may, at any time, revise, amend, suspend, or terminate in whole or
in part, any or all provisions of the Plan." *Id.* at *1, *3. The court reasoned that inclusion of
these provisions left "no doubt that [the defendant] intended merely to set forth an incentive
arrangement, not a binding contract." *Id.* at *3.

A Texas appellate court has reached a similar conclusion in *Stinger v. Stewart &
Stevenson Services, Inc.* There, the court rejected an employee's breach-of-contract claim
because the incentive arrangement disclaimed any binding effect. 830 S.W.2d 715, 720
(Tex. App—Houston [14th Dist.] 1992, writ denied). The relevant language included a
disclaimer that the arrangement was not a contract and that the arrangement could be
modified upward or downwards at any time at the company's discretion. *Id.* at 717. The
court held that language giving the company unqualified sole discretion to modify the
agreement rendered the arrangement merely an aspirational incentive and not an
enforceable obligation. *Id.* at 719.

The Fourth Circuit similarly held that certain commission plans with adequate
disclaimers are not contractually enforceable. In *Jensen v. International Business Machines*

*Corp.*, the defendant, IBM, provided documents to employees outlining potential commission-compensation plans.  454 F.3d 382, 388 (4th Cir. 2006).  While the document included definite monetary figures, it also contained clear disclaimers, including that "this program does not constitute a promise by IBM to make any distributions under it" and that "[n]o one becomes entitled to any payment in advance of his or her receipt of the payment." *Id.*  The panel held that the company "made clear that there were no conditions that [the employee] could satisfy to create a binding contract" where the company "unambiguously characterized sales commission as a form of incentive pay that it intended to make but which it reserved the right to calculate or even not make, even after sales were closed." *Id.*

But *Jenson* also clarified that merely including a general statement in the offer that the employer retains the power to modify the terms does not preclude the formation of an enforceable contract.  *Id.* at 387.  "[S]uch a vague statement does no more than restate the employer's common-law right to modify the terms of at-will employment.  An employer must use clearer language to change the time when the employee's rights vest." *Id.* at 387–88.

The 2017 Plan is distinguishable from the unenforceable arrangements discussed above.  Most notably, the 2017 Plan does not expressly disclaim its use as an enforceable contract.  To the contrary, it includes language that would suggest the parties intended to form an enforceable contract.  For example, the 2017 Plan encouraged the employee to consult with their manager prior to "execution." Dkt. No. 27-8 at 3.  Additionally, the 2017 Plan included a severability clause, which shows the parties anticipated that the plan may be interpreted by a court and deemed unenforceable.  *Id.* at 6.  This is distinguishable from *Oldham*, which left the final interpretation and enforcement to the company, because the 2017 Plan, by anticipating that a court may interpret and enforce the plan's terms, did not

grant SuddenLink the sole authority to review the plan. Finally, the 2017 Plan contains a venue and choice-of-law provision outlining what law governs the interpretation and enforcement of the plan. *Id.* at 7.

The 2017 Plan does include some disclaimer language regarding SuddenLink's duties and obligations under the plan. Specifically, there are three sentences in the 2017 Plan that identify SuddenLink's ability to modify the plan and some commissions. These are: "Management retains the exclusive right and discretion to review and prospectively modify the Plan and/or any quota upon reasonable notice to Employee." *Id.* at 5. "Management further retains the right to modify any commission calculations where circumstances warrant." *Id.* "In accordance with applicable law, the Company reserves the right to amend this Plan at any time; provided that any amendment shall apply prospectively." *Id.* at 7.

The first discretionary provision—regarding the plan or quota—is not unqualified because it requires reasonable notice to the employee, and it only permits prospective changes. The second provision appears to give SuddenLink discretion to modify any commission—as opposed to the entire plan—but only "where circumstances warrant." And finally, the third provision, like the first, requires that any modification must be prospective. The 2017 Plan does not contain the same clear disclaimers present in the cases cited by SuddenLink. Instead, it falls squarely into the category discussed in *Jenson* where the company retains the right to modify the terms prior to their acceptance. This suggests that the parties did not intend to preclude the formation of an enforceable contract. Consequently, the Court finds that the inclusion of the modification provisions does not demonstrate an intent to preclude the creation of an enforceable contract.

### ii.   The 2017 Plan is an enforceable unilateral contract that was accepted through performance.

Neither party contends that the 2017 Plan was a bilateral contract, but rather dispute whether a valid unilateral contract was formed. "A unilateral contract is created by the promisor promising a benefit if the promisee performs. The contract becomes enforceable when the promisee performs." *Owens*, 694 F. App'x at 953–54 (quoting *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009) (internal quotation marks omitted). "The requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in exchange for the promise is something other than a promise, i.e., performance." *City of Hous. v. Williams*, 353 S.W.3d 128, 136 (Tex. 2011) (internal quotation marks omitted). "[A] unilateral employment contract is created when an employer promises an employee certain benefits in exchange for the employee's performance, and the employee performs." *Id.*

The Texas Supreme Court has recognized unilateral contracts, even where certain terms were illusory at the time the offer was made. In *Vanegas v. American Energy Services*, a company offered several employees five percent of the proceeds of a sale or merger of the company if the employees remained employed through the sale or merger. 302 S.W.3d at 303. While the company could have fired the employees at any time to avoid paying that share, the company did not terminate their employment, and some of the employees stayed on board for the requested time. *Id.* The court held that a unilateral contract was formed when the employees accepted the offer and performed under the promise by remaining employed through the sale or merger. *Id.* In its reasoning, the court noted that a "unilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for the state period." *Id.* (quoting 2 Joseph M.

Perillo & Helen Hadjiyannakis Bender, Corbin on Contracts § 6.2 (1995)).  Therefore, a unilateral employment contract is created when an employer promises an employee a certain benefit—such as additional compensation—in exchange for the employee's performance, and the employee performs.  *Id.*

The Texas Supreme Court further explored the scope of unilateral contracts with particular disclaimers in *City of Houston v. Williams.*  353 S.W.3d at 131.  In *Williams*, a group of retired firefighters brought a breach-of-contract action against the City of Houston based on the City's alleged underpayment of lump sums owed to the fire fighters.  *Id.* at 131–32.  The City argued that the relevant ordinance could not create a contract because it included a disclaimer that "[n]o provision of this ordinance shall be construed to create a vested right of compensation for sick leave benefits or, where applicable, for termination payments."  *Id.* at 140.  The court rejected this argument, stating that "[d]isclaiming a vested right to compensation is not equivalent to a disclaimer of contractual intent—to the contrary, an employee may have a valid employment contract promising that benefits will accrue upon performance, but those benefits will not vest until the employee actually performs."  *Id.*  The court further reasoned that these disclaimers were merely warnings to employees that the benefits may change over time and that the promise remains illusory until performance.  *Id.*  Ultimately, the Texas Supreme Court recognized that despite the disclaimers about modification of the time of vesting, there was still a valid contract once the firefighters performed under the offer.[9]

---

[9] The court noted that "offerors generally have the power to revoke or modify offers until the offeree accepts or performs, assuming the revocation or modification is communicated to the offeree before any attempted acceptance."  *Williams*, 353 S.W.3d at 140 n.12.

Here, to the extent that the disclaimers did not preclude the existence of a contract, the parties agree that the 2017 Plan created a unilateral offer. Dkt. No. 31 at 15; Dkt. No. 34 at 17. However, the parties disagree about what constituted valid acceptance under the Plan. The plaintiffs contend that the 2017 Plan constitutes a unilateral offer by SuddenLink to pay their respective commissions upon the performance outlined in the plan.[10] Dkt. No. 31 at 5. Conversely, SuddenLink points to the plan's language and maintains that the plaintiffs' right to payment under the plan did not vest because the plaintiffs did not fully perform and "earn" the commission as set out in the 2017 Plan. Dkt. No. 34 at 22. The 2017 Plan provides that commission is only earned after a specified chargeback period as discussed in Part 2.B. While SuddenLink contends that no contract was formed, because the commissions were not earned before SuddenLink modified them, that does not affect the formation of a contract.

<blockquote>

a.   **The clearance of chargebacks that generated the commission's payment is merely a condition precedent to SuddenLink's performance— not to contract formation.**
</blockquote>

Under the 2017 Plan, before the plaintiffs earned their commission, the commission-earning sale was required to endure past the chargeback period. Dkt. No. 27-8 at 5. The Court finds that this requirement was a condition precedent to payment, but not to contract formation.

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 412 (5th Cir. 2009) (citing *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992)). Conditions precedent may condition either the initial formation of a contract or an obligation to perform an

---

[10] Because neither party contends that the 2017 Plan is a bilateral contract, the terms of the plan can only be accepted through performance.

existing agreement. *Hogan v. Goldsmith*, 533 S.W.3d 921, 924 (Tex. App.—Eastland 2017, no pet.). Generally, there are no magic words needed to create a condition. *Id.* To determine whether a condition exists, a court should look to the intentions of the parties by looking at the contract as a whole. *Id.*

Here, the 2017 Plan provided that commissions are not earned—in that they are final—"until the commission is no longer subject to . . . Chargebacks." Dkt. No. 27-8 at 5. This provision reflects an intention to relieve SuddenLink from its obligation to pay the commission in the event that a sale is not finalized or does not survive the relevant chargeback period. But nothing in the 2017 Plan suggests that the formation of the contract was contingent on the finalization of a sale. If that were the case, then a contract might not be formed even years after one party completes performance. Instead, it is clear from the context and express language of the contract that SuddenLink's obligation to pay the commission was not triggered until the satisfaction of the condition. This means that if the condition was not met—and the sale fell through—SuddenLink was relieved from that obligation.[11] Therefore, the Court finds that there could still be a contract prior to the satisfaction of the condition

### b. The plaintiffs accepted SuddenLink's unilateral offer and formed an enforceable contract when it closed the WTTC deal.

The 2017 Plan contemplated certain performance by the plaintiffs—closing sales for the company—to form an enforceable contract. Here, the performance requested was

---

[11] This reading of the plan is also consistent with the real-world context of sales. SuddenLink is not obligated to pay commission on a sale that is not consummated and finalized. Once a sale is signed, a contract is formed for commission under the 2017 Plan, and it becomes final following the chargeback period. While the commission may change based on a change in the sale, there may be an enforceable obligation to pay commission on the final sale.

completed—and thus the offer accepted, and the contract formed—in May 2017. Even though the plaintiffs argue that the offer was accepted through substantial performance, there was nothing further that they could have done to alter the contract. They merely had to wait for the condition precedent to be satisfied to receive their commission. The condition was satisfied upon the completion of the deal's installations in 2019.

SuddenLink appears to argue that the plaintiffs had no right to commission payments because they had yet to "earn" the commission under the plan. The Court does not find this argument persuasive because an enforceable contract was formed pursuant to the terms of the plan even before the commission could be earned. Contrary to SuddenLink's position, the performance sought by the 2017 Plan was not that the sale would survive the chargeback period. Instead, the 2017 Plan could be accepted merely by closing sales, which is understandable given that many of the subsequent developments in a deal are outside of the sales team's control. In other words, the unilateral offer was accepted, and a contract formed, when there was nothing else for the plaintiffs to do. Therefore, the 2017 Plan was accepted when the parties closed the sale, not when the commission was earned. Accordingly, the Court finds that the parties formed a valid contract when the WTTC deal closed.

### iii.    There is an issue of material fact regarding why SuddenLink modified the commission calculation.

"In construing a written contract, the Court's task is to ascertain the intentions of the parties as expressed in the contract." *Marathon E.G. Holding Ltd v. CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)). In doing so, the court gives "the terms of a contract their plain, ordinary, and generally accepted meaning unless the contract shows them to be used in a technical or

different sense." *Id.* (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). "A contract is not ambiguous when the contract is worded such that its terms can be given a definite meaning." *Id.*

Plaintiffs argue that SuddenLink breached the terms of the 2017 Plan when it retrospectively modified their commission for the WTTC deal in November 2018. Dkt. No. 31 at 23. In the plaintiffs' motion for partial summary judgment, they assert that, as a matter of law, SuddenLink's actions breached the terms of the agreement. Their argument is premised on the requirements that any modifications to a commission plan may only be prospective, that SuddenLink must provide reasonable notice, and that SuddenLink may modify commissions only where circumstances warrant. Conversely, SuddenLink contends that it possessed absolute discretion to unilaterally modify the terms of the plan at any point for any reason. The Court finds that there is only a genuine issue of material fact as to whether the circumstances warranted a reduction in commission.

> a.   **SuddenLink did not modify the 2017 Plan, and therefore, the Court does not need to consider whether a modification was prospective or whether plaintiffs received reasonable notice.**

Plaintiffs rely on the 2017 Plan language requiring that any plan modification be prospective and accompanied by reasonable notice. Dkt. No. 36 at 18–21. The Court agrees that the plan's language expressly qualified SuddenLink's right to modify the plan prospectively, but these provisions do not apply to the WTTC commission modification. The only modifications that SuddenLink made to the 2017 Plan was superseding the plan with the 2018 Plan and subsequently the 2019 Plan. However, this required neither notice nor prospective application. The 2017 Plan expressly granted SuddenLink absolute

discretion to supersede the plan with another written plan.[12]  The WTTC deal modification only modified one commission calculation and not the entire plan or even other commissions; therefore, it did not need to comply with these terms.  Thus, the Court need not consider whether SuddenLink breached the notice or prospective application-requirements of the 2017 Plan.

> **b.    The 2017 Plan only permitted SuddenLink to modify a commission calculation "where circumstances warrant."**

The 2017 Plan expressly provided that "Management further retains the right to modify any commission calculation where circumstances warrant."  *See* Dkt. No. 27-8 at 5.  SuddenLink did not modify the entire plan because the contested action only altered a single—albeit a very sizable—commission calculation.  Therefore, the Court must evaluate the meaning of "where circumstances warrant."

The 2017 Plan neither defined the relevant terms nor suggested that the terms are used in a technical or different sense.  Additionally, the 2017 Plan did not give SuddenLink the authority to interpret the plan or determine particular terms' meanings.[13]  Consequently, the Court gives the plan's terms their plain, ordinary, and generally accepted meaning.  To determine a term's plain, ordinary, and generally accepted meaning, courts look to contemporary dictionaries—those that reflect the terms meanings at a specific time.[14]  *See,*

---

[12] "This Plan shall remain in full force and effect from the Effective Date until Altice issues a written replacement plan or the Employee's employment with Altice is terminated, whichever occurs earlier."  Dkt. No. 27-8 at 6.

[13] As discussed in Part 4.B.i., the plan expressly mentioned interpretation of the plan's meaning by a court and did not give final discretion to SuddenLink.  If the parties intended to give SuddenLink this authority, they would have used clear language to do so.

[14] "Among contemporaneous-use dictionaries—those that reflect meanings current at a given time—the following are most useful and authoritative for the English language generally and for law. . . . *Merriam-Webster's Collegiate Dictionary*[.]"  Antonin Scalia & Bryan A. Garner, *Reading Law* 419, 423

*e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (consulting contemporaneous dictionaries to surmise the definition of the term "confidential").

"Circumstance" is defined as "a condition, fact, or event accompanying, conditioning, or determining another." *Circumstance*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). "Warrant" is defined as "evidence for or token of authorization." *Warrant*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Thus, under the 2017 Plan's terms, SuddenLink may only modify a commission calculation where there was a condition or fact that authorized a modification. Without such authorization, the plan did not give SuddenLink authority to modify a commission calculation.

### c.    The Court finds that the commission-modification provision is not ambiguous.

Courts may assume parties intend every provision in an agreement to have some effect—that is, the parties do not intend to include surplusage. *Westwind Exploration, Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985). Reasonable interpretations of an agreement are preferred to those that are unreasonable. *Id.* And in determining the meaning of a provision, courts must examine the entire writing as a whole, giving these provisions meaning in context of the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Generally, Texas courts are reluctant to examine the parties' subjective understandings as to the meaning of certain language without first finding the language ambiguous. *See, e.g.*, *Sun Oil (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). A trial court may conclude that a contract is ambiguous as a matter of law even if neither party

---

(2012) (identifying the Merriam-Webster's Collegiate Dictionary as a scholarly and authoritative dictionary for the period of 2001 to the present).

alleges.[15]  *Sage Street Assocs. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex. 1993); *Coker*,

650 S.W.2d at 393.  A mere disagreement on the meaning of a provision by the parties does

not render it ambiguous.  *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015).  A

contract is not ambiguous if it can be given a certain or definite legal meaning or

interpretation but is ambiguous if it is reasonably susceptible to more than one meaning.

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

The Court "may consider the facts and circumstances surrounding a contract,

including 'the commercial or other setting in which the contract was negotiated and other

objectively determinable factors that give context to the parties' transaction.'" *Kachina*, 471

S.W.3d at 450 (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)).  While

such evidence may be considered to inform on the text and render it capable of only one

meaning, extrinsic evidence may only be considered to interpret an ambiguous writing, not

to create ambiguity.  *Id.*

The parties disagree on the interpretation of the commission-modification provision

in the 2017 Plan.  Plaintiffs argue that the commission-modification provision limited

SuddenLink's authority to circumstances where project costs and revenue changed over the

course of the project.[16]  Dkt. No. 36 at 24.  Conversely, SuddenLink contends that any valid

business decision is a warranting circumstance.  Dkt. No. 40 at 25.  These two

interpretations conflict with one another, as one requires a specific condition and the other

places the sole discretion in the hands of one party.  At first glance, these appear to be two

---

[15] However, if no party has raised ambiguity in its pleadings, construction of the contract is a matter of law.  *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968).

[16] This means that if the deal changed as it developed, whether an increase in costs or decrease, SuddenLink could modify the commission calculation to reflect the final value of the commission, not just the anticipated commission from the initial sale.

reasonable interpretations of the commission-modification provision, but the Court must view the provision in the context of the entire agreement, seek to render no term surplusage, and give preference to reasonable interpretations. SuddenLink's interpretation does not align with any of these principles.

First, SuddenLink's interpretation is not consistent with the entire 2017 Plan. SuddenLink's unchecked discretion to modify a commission would permit SuddenLink to make a modification even after the money had been earned and paid. It would also allow SuddenLink to retroactively make modifications, without notice, to the express terms of the 2017 Plan. Second, SuddenLink's interpretation is unreasonable because it would grant SuddenLink unfettered discretion to terminate the contract. As discussed above in Part 4.B.i. SuddenLink did not include a clear disclaimer or reserve discretion to take such actions. Third, SuddenLink's interpretation renders "where circumstances warrant" surplusage because it grants SuddenLink unqualified authority to make changes based on a business decision, and every decision by SuddenLink—a business—could be considered a business decision. In application, the provision would have the same meaning if it simply read: "Management further retains the right to modify any commission calculation." Therefore, the Court finds that such a reading would render parts of the provision surplusage. Weighing these considerations, the Court rejects SuddenLink's interpretation.

In contrast, plaintiffs' interpretation satisfies each of the essential requirements. First, it gives the phrase "circumstances" meaning in the context of the entire agreement to include circumstances where the project changes. Second, it is not unreasonable because it balances the parties' duties and would not result in forfeiture or an illusory agreement.

24

Finally, this interpretation does not render any of the provision surplusage, giving meaning to each term. Therefore, the Court adopts the plaintiffs' interpretation.[17]

> **d.     The Court finds that there is a genuine dispute of material fact regarding the reason SuddenLink modified the WTTC deal commission, and thus whether SuddenLink had authority to do so.**

Plaintiffs contest SuddenLink's justifications for the downward modification and argue that there is a dispute of material fact regarding why SuddenLink modified the commission. In its summary-judgment motion, SuddenLink states that it reduced plaintiffs' commission based on the company's profitability calculations. However, SuddenLink's representative testified in his deposition that SuddenLink reduced the commissions merely because they were large and for no other reason. Dkt. No. 27-4 at 20. Because there is conflicting evidence regarding the actual reason that SuddenLink reduced the commission, this is a question of fact for the jury.

> **C.     The Court declines to rule on plaintiffs' good faith and fair dealing claim under Missouri law.**

A plaintiff may not raise a new claim for the first time at the summary-judgment stage. *United States ex rel. DeKort v. Integrated Coast Guard Systems*, 475 F. App'x 521, 522 (5th Cir. 2012) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990). The appropriate procedure for plaintiffs to assert new claims at the summary-judgment stage is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a). *Id.* (quoting *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004)).

---

[17] Even if the Court finds the term "where circumstances warrant," in the context of the 2017 Plan, to be ambiguous, its interpretation would be construed against SuddenLink as the drafter of the plan. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990).

Here, plaintiffs' raise a claim of good faith and fair dealing under Missouri law for the first time in their response to SuddenLink's motion for summary judgment. Dkt. No. 36 at 27. Because this is improper and the plaintiffs have not moved to amend their complaint, the Court declines to reach the merits of this claim.

### D.    The Court need not reach plaintiffs' potential claims for unjust enrichment and quantum meruit because the Court finds that a contract exists.

Unjust enrichment and quantum meruit are forms of recovery that are only appropriate when there is not an express contract governing the dispute. *See Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988). Therefore, the existence of an express contract will generally preclude recovery under these theories. *Id.* Here, the Court finds that the 2017 Plan constitutes a valid and enforceable contract following the plaintiffs' performance. As a result, these equitable claims are unavailable to the plaintiffs.

### 5.    Conclusion

For the reasons stated above, the Court denies SuddenLink's motion for summary judgment and grants the plaintiffs' motion in part.

So ordered on April 16, 2021.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE